MADDOX, Justice.
This is an appeal by the defendant King Coal Company, Inc. from a judgment entered pursuant to a jury verdict in an action for breach of contract involving an agreement to strip mine coal.
In this opinion, we discuss three questions:
(1) Was there a sale of goods that would bring this transaction within the provisions of Article 2 of the Uniform Commercial Code?
*887 (2) Was there adequate evidence to sustain the finding that the defendant breached the contract?
(3)' Could the plaintiff recover for the loss of profits he expected to make?
We answer all three questions in the negative and, therefore, reverse and remand the cause for a new trial.
Plaintiffs, Nile and Jimmy Garmon, were lifelong residents of Cullman County, Alabama. They had never been in the coal business for themselves prior to the transaction made the basis of this suit, although Nile Garmon had worked for the Drum-mond Coal Company for some 19 years.
Nile Garmon knew of the forty acres involved, that Bland McClendon owned the surface rights and that King owned the mineral rights. Nile succeeded in leasing surface rights from McClendon and then in contracting with King to mine the coal. The Garmons contacted an attorney in Cull-man who drew up the lease agreement between the Garmons and Bland McClendon and also advised them to do business as G & G Coal Company. Under the lease agreement with McClendon for the surface rights, McClendon was to receive $3.00 royalty per ton of coal mined from his property-
The initial contact with King was made by Nile Garmon and after several discussions an agreement was eventually reached. There was testimony that during these discussions, representatives of King, Roy Davidson and Sam Shiflett, explained to Nile Garmon that King had two contracts for the delivery of coal and none other. These contracts were with Alabama Power Company and United States Steel (TCI), which called for the delivery of metallurgical coal.
After the agreement was reached between King and the Garmons, they met in Cullman at the law office of James Thompson and the contract between the parties was drawn. The contract, which is made the basis of this suit, contained the following:
“H. King agrees to pay to miner, subject to the hereinafter set forth deductions, the sum of $20.00 per ton for each ton of Black Creek coal having less than 1% sulphur content and less than 8% ash content, loaded on the trucks of King at the mine. From said $20.00 per ton shall be deducted the following: . . .
“B. In the event that the coal removed from said property does not meet the standards as to sulphur and ash content heretofore set forth there shall be imposed against said $20.00 the same penalty as is imposed upon King by the purchasers of said coal from King.”
The coal mined by the Garmons did not meet the standards as to either sulphur or ash. There was testimony that “Black Creek Coal” meant metallurgical coal as opposed to the term “Jefferson Seam Coal” which meant steam coal. Nile Garmon testified about the difference as follows:
“Q (BY MR. HALE:) How long have you been around coal mines in the mining business, Mr. Garmon?
“A Since I was eighteen years old, approximately twenty years.
“Q Approximately twenty years?
“A Yes.
“Q At this particular time?
“A Yes, sir.
“Q You have been mining or around mining that whole time?
“A Yes, sir.
“Q Are you familiar with Black Creek coal?
“A Yes, sir, I am.
“Q Do you know what it looks like?
“A Yes, sir.
“Q Have you ever stripped any Black Creek coal before?
“A Yes, sir, I have.
“Q Have you ever stripped any Jefferson Seam coal before?
“A Yes.
“Q Do you know the difference between the Black Creek Coal and Jefferson Seam coal from just looking at it?
“A Yes, sir.
“Q Mining it?
*888 “A Yes, sir. Well, not necessarily looking at it, by the specifications of what the coal runs and the ash and the sulphur content.
“Q Could you generally tell when you’re taking the overburden off of the coal, the rock formations, the crust, that sort of thing?
“MR. ST. JOHN: We object to that, he testified he couldn’t tell by looking at it.
“THE COURT: Did I understand you to say that you couldn’t tell by looking at it, Mr. Garmon?
“A Yes, sir, you can’t tell by that.
“THE COURT: Sustained.
“Q (BY MR. HALE:) Are jthere any indications other than an analysis of the coal whether or not it is Black Creek coal or Jefferson Seam coal?
“A Yes, sir, there is lots of different ways to verify it, the elevation of the coal most of the time, you run into Black Creek coal around five hundred foot elevation.
“Q Around five hundred foot elevation? “A Yes.
“Q Is Jefferson Seam coal usually found higher or lower?
“A Higher.
“Q Jefferson Seam is higher than Black Creek coal?
“A Yes, sir.
“Q When you say elevation there, you are talking about on a topo map?
“A Yes, the level on the elevation in this County, Black Creek coal is found between five, five fifty and six, in that area.”
When questioned about the agreement, Nile Garmon testified:
“Q Did you read the agreement, the contract before you signed it?
“A Yes, sir, I did.
“Q So, I assume that you saw the section that mentioned Black Creek coal? “A Yes, sir, I did.
“Q And you saw the section saying less than one percent sulphur content and less than eight percent ash content?
“A Yes, sir, I did.
“Q So, you knew at the time of the signing that the coal that you had to deliver would have to be within those specifications and be Black Creek coal or you would suffer a loss?
“A Yes, sir, I did.
“Q From the $20.00 per ton?
“A Yes, sir.
* * * * * *
“Q Did you produce and mine any coal from the property as you were required by the contract having less than one percent sulphur and less than eight percent ash, yes or no?
“A No.”
Metallurgical coal is a high grade coal, low in contaminants, used in the working of metals, while steam coal is low grade coal, with contaminants, used in producing heat at steam plants.
The penalty assessed against King by United States Steel for coal containing as much as 8% ash and 1.1% sulphur was rejection of the coal and Alabama Power’s contract allowed rejection of the coal if the sulphur content exceeded 0.6 pounds of sul-phur per one million BTU heat content, and suspension of future shipments.
After the coal was found not to meet the specifications of the contracts and was rejected by King, the Garmons ceased their mining operations. Efforts of King to assist in finding a buyer for the mined coal were unsuccessful, and the Garmons eventually sold it to Ray Marsh of Oneonta. A total of 1,911.83 tons of steam coal was delivered to Marsh which, after washing, was reduced to 1,296.34 tons. The washing decreased the volume of the coal by 32%, which was an unusually high loss. The Garmons were paid $14.12 per ton for a total of $18,304.32 by Marsh. The price per ton was reduced from $24.12 per ton to cover expenses of hauling and preparing the coal for sale.
I
Was there a sale of goods that would bring this transaction within the provisions *889 of Article 2 of the Uniform Commercial Code?
Appellant contends that under the facts of this case, there was not a “sale” because “[I]t is elementary that a man cannot ‘sell’ that which he does not own.”
Counsel for the Garmons, on the other hand, submit that the subject contract was a contract for the sale of identifiable goods such that it would bring the transaction within the provisions of the Uniform Commercial Code. (Code 1975, § 7 — 1—101, et seq.) We agree with the appellant that the transaction here did not constitute a sale.
Generally speaking, under the U.C.C., the damaged party in a sales transaction has greater rights of recovery than he does under the common law in an action for breach of contract.
Code 1975, § 7-2-106(1) reads, in part, as follows:
■ “In this article unless , the context otherwise requires ‘contract’ and ‘agreement’ are limited to those relating to the present or future sale of goods. ‘Contract for sale’ includes both a present sale of goods and a contract to sell goods at a future time. A ‘sale’ consists in the passing of title from the seller to the buyer for a price . . ..” (Emphasis added.)
In this case, title to the minerals was held by King Coal by virtue of its agreement with a partnership composed of Taylor, Raines and Harrison. The Garmons held an interest in the surface rights by virtue of their lease with Bland McClendon. Under the facts of this case, there could be no sale of the coal from the Garmons to King, because the Garmons could not pass title to the coal; title was already in King.
The contract between the Garmons and King noted that: “King and miner [Gar-mons] are mutually desirous of removing the coal from the land described in the McClendon lease.” The contract further put third parties on notice that the instrument should not be construed as creating a partnership between King and the Gar-mons. Several clauses in the contract provided that the Garmons, as “miner,” were to remove the coal from the property.
388 So.2d —21
Nile Garmon, testifying on cross-examination, explained the arrangement:
“Q So, King Coal Company didn’t come to you and ask you to work out this deal, you went to them, is that right?
“A Yes, sir, I did.
“Q What was their first reaction?
“A Marvin Davidson was real interested. They had prior to that time, had people sub-contract mining in that area for them and they were interested in sub-contracting and he told me that they would be glad to work with me on it.”
We conclude that this transaction was not a contract for the sale of goods, and therefore, did not come within the provisions of the U.C.C.
II
Was there adequate evidence to sustain the finding that the defendant breached a contract? We think not.
The agreement which is made the basis of this suit contained the following provisions:
“H. King agrees to pay to Miner, subject to the hereinafter set forth deductions, the sum of $20.00 per ton for each ton of Black Creek Coal having less than 1% sulphur content and less than 8% ash content, loaded on the trucks of King at the time....
“(a.) * * *
“(B.) [sic] In the event that the coal removed from said property does not meet the standards as to sulphur and ash content heretofore set forth there shall be imposed against said $20.00 the same penalty as is imposed upon King by the purchasers of said coal from King.”
Although there was some testimony that the 2,000 tons of coal mined by the Garmons could have been “Black Creek coal,” there was no evidence that it, in fact, was “Black Creek coal.” There was no evidence that the coal minimally met the sulphur and ash specifications of the contract. The Gar-mons do not contend that the mined coal met the contract specifications. In their brief, the Garmons argued:
*890 “In finding for the Plaintiff, the jury found that the defendant, King Coal Company, breached the contract. King Coal Company had an interest in the mineral rights by virtue of an agreement with the mineral owners of Taylor, Raines and Harrison. G & G Coal Company had an interest in the surface rights by virtue of an agreement with the owner of the surface rights, Bland McClen-don. King Coal Company agreed to purchase the coal or goods from G & G Coal Company under the April 6, 1977 agreement. By inference, the jury did not buy the story King Coal Company was selling that only black creek coal was to be purchased by them. We have both compensatory and loss of profits awarded by the jury.” (Emphasis added.)
As can be seen, the Garmons seek to sustain the jury verdict on the theory that they were selling coal to King. We have been unable to locate a case similar to the one here, but we are convinced, as we have already pointed out, that a person cannot “buy” what he already owns. King owned the mineral rights; therefore, the Garmons had no title to the coal. In any event, it is undisputed that the Garmons sold the coal which was mined by them and received $18,304.32 after expenses of hauling and preparing the coal were deducted. King received nothing, although the coal belonged to King. By making this point, we should not be understood as holding that King was entitled to receive anything, only that the Garmons were not left empty-handed.
We are aware that this Court has stated many times that verdicts are presumed to be correct and “that no ground in a motion for a new trial is more carefully scrutinized and more rigidly limited than that the verdict is contrary to the weight or preponderance of the evidence.” Deal v. Johnson, 362 So.2d 214 (Ala.1978). When a verdict is against the weight or preponderance of the evidence, and is wrong and unjust, this Court may grant a new trial. After reviewing the evidence in this case, we are of the opinion that the Garmons failed to prove by competent evidence that King Coal breached its contract obligations. The evidence is undisputed that the Gar-mons failed to show that they had produced coal which would meet the contract specifications. The penalty for non-compliance in this case was shown to be rejection of the coal. This Court is convinced that the finding that the defendant breached the contract is wrong and unjust. King’s motion for a new trial should have been granted.
Ill
Were the plaintiffs entitled to recover for loss of profits? We hold that they were not.
The record on appeal reads, as follows:
“THE COURT: Let the record show that we are out of the presence of the jury. Do you withdraw your demand, your request for loss of profits, you’re going to put in reversible error if I charge on it, on loss of profits.”
The court then overruled King Coal’s objection to the Garmons’ argument on loss of profits, but entered into the following colloquy with the attorney for the Garmons:
“THE COURT: ... You want me to charge on loss of profits?
“Mr. HALE: Do I want you to charge on loss of profits?
“THE COURT: Yes.
“MR. HALE: You are refusing then?
“THE COURT: You have the right, still to withdraw your request that the Court charge on loss of profits.
“MR. HALE: I need to talk to him and see if he wants to.
“THE COURT: You’ve got about ten minutes.”
The court charged the jury on loss of profits, but the court ordered the jury to make separate verdicts for compensatory damages and lost profits, if they found for the plaintiffs. The trial court erred in refusing to set aside the verdict for lost profits and in not granting to the defendant a new 'trial.
It is undisputed that the Garmons were engaging in a new business for which they *891 had no record of past profits, expenses or overhead.
In Blankenship v. Lanier, 212 Ala. 60, 101 So. 763 (1924), this Court stated the general rule on the recovery of lost profits in a case sounding in contract:
“Hence, it has been generally, and we think correctly, held that ‘the gains or profits of collateral enterprises or subcontracts are, as a rule, too speculative and contingent to afford an element of recovery in the case of a breach of the primary contract.’ 17 Corp.Jur. 793 (section 115), and the numerous cases cited under note 82. Our own cases sustain this view. Reed Lumber Co. v. Lewis, 94 Ala. 627, 10 So. 333; Dickerson v. Finley, 158 Ala. 149, 48 So. 548. The only exception seems to be that ‘the loss of profits from the destruction or interruption of an established business may be recovered for, if the amount of actual loss is rendered reasonably certain by competent proof; but in all such cases it must be made to appear that the business which is claimed to have been interrupted was an established one, and that it had been successfully conducted for such a length of time, and had such a trade established, that the profits thereof are reasonably ascertainable.’ 17 Corp.Jur. 795-797 (section 117), and cases cited under note 95. And ‘where a new business or enterprise is floated and damages by way of profit are claimed for its interruption or prevention, they will be denied, for the reason that such business is an adventure, as distinguished from an established business, and its profits are speculative and remote, existing only in anticipation.’ Id., 797 (section 118).”
The cause is due to be reversed and remanded for further proceedings not inconsistent with this opinion.
REVERSED AND REMANDED.
TORBERT, C. J., and JONES, SHORES and BEATTY, JJ., concur.